IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHAWN MICHAEL MARTIN,                          Case No. 6:11-cv-06420-AC

                        Plaintiff,            FINDINGS & RECOMMENDATION

              v.

DR. DEWSNUP, OREGON STATE
PENITENTIARY(OSP), GARTH
GULICK M.D., SNAKE RIVER
CORRECTIONAL INSTITUTION
(SRCI), JANE DOE #1 (SRCI), JOHN DOE
#1 (SRCI), ESTRADA (SRCI), JOHN DOE
#2 (SRCI), JOHN DOE #3 (SRCI), JOHN
DOE #4 (SRCI), JANE DOE #2 (SRCI),
JANE DOE #5 (SRCI), JOHN DOE #5 (SRCI),
JOHN DOE #6 (SRCI), S. PALMER (SRCI),
MARK NOOTH (SRCI), S. JENNINGS
(SRCI), MICHAEL S. PAYNE (SRCI), MR.
FRANKS (SRCI), TED RANDALL (OSP),
DR. STEVE SHELTON, M.D. (OSP), DR.
VARGO (OSP), DR. HANSEN, (OSP), DR.
DEGNER (OSP), JANE DOE #6 (OSP) JANE
DOE #7 (OSP), JANE DOE #8 (OSP), JOHN

FINDINGS & RECOMMENDATION - 1                                    [RMD]

DOE #10 (OSP) MR. JONES (SRCI), TRAVIS
J. HAYS (OSP), SARGENT HARRIS (OSP),
JASON HANSON (OSP), SERGEANT
HAZEN (SRCI), L.T. PARKER-KENT (OSP),
LIEUTENANT J. ETTER (OSP), FOSTER
(OSP), CORPORAL HARBAUGH (OSP),
JULIE STORY (OSP), PETERSON (OSP),
YANCEY (OSP), CORPORAL ROSE (OSP),
HALE (OSP), R. ROGERS (OSP), JANE
DOE #9 (OSP), JOHN DOE #11 (OSP),
SABRINA (NURSE OSP), IRENE (NURSE
OSP), SGT. OBERFOELL (OSP), SMITH
(OSP), MICHAEL PUERINI, OREGON
DEPARTMENT OF CORRECTIONS (ODOC),
ROBERT SNIDER (ODOC), BEV SMITH
(ODOC), ELIZABETH SAZIE (ODOC),
SHAWN ELLIOT (ODOC), SERGEANT
PHILLIPPI (OSP), SERGEANT GARBER
(OSP), SERGEANT GORE (OSP),
SERGEANT SHASTEEN (OSP), JEFF PREMO
(OSP), CRUZ (OSP), PRIES (OSP), FREEMAN
(OSP), MRS. REDING (OSP), all in their
individual and official capacities acting under
Color of State Law, for Their actions and/or
in-actions,

                                 Defendants.

_____

ACOSTA, United States Magistrate Judge

       Until recently, Plaintiff Shawn Michael Martin was incarcerated by the Oregon Department

of Corrections ("ODOC"). He now brings this § 1983 claim against twenty-four named defendants

and eight Doe defendants (collectively "Defendants") for violations of Martin's Constitutional

Rights. Martin alleges Defendants violated his First Amendment and Eighth Amendment rights

while Martin was housed in Snake River Correctional Institution ("SRCI") and Oregon State

Penitentiary ("OSP"). Martin's complaint previously named many more defendants, but Federal

District Judge Marco Hernandez ("Judge Hernandez") sua sponte dismissed some of Martin's claims

as frivolous. (Dkt. Nos. 8, 33.) Defendants now move for summary judgment on Martin's remaining claims. After careful review of the voluminous record, the court concludes defendant's motion should be granted in part and denied in part.

*Factual Background*

Martin was admitted to the custody of ODOC on March 25, 2008, and was released from custody on July 20, 2015. (Decl. Of Michael Palmer ("Palmer Decl.") ¶ 3.) During his incarceration, Martin was housed in two different correctional institutions. From April 2008 to October 2010, Martin resided in SRCI, and from October 2010 to the date he filed this case, he was incarcerated at OSP. (Amended Complaint ¶¶ 10, 47.)[1]

When Martin was first admitted to ODOC custody, he was housed in OSP, where he underwent an intake medical examination with Corrections Physician Specialist Daniel Dewsnup, D.O. ("Dr. Dewsnup"). (Declaration of Daniel Dewsnup ("Dewsnup Decl.") ¶ 15.) At his intake exam, Martin disclosed he had Hepatitis C Virus ("HCV"), and that in 2003 while he was incarcerated in Illinois, doctors performed a liver biopsy indicating a diagnosis of cirrhosis of the liver. (*Id.*) At that time, Dr. Dewsnup did not have Martin's medical records from the Illinois prison where he underwent the biopsy and was diagnosed with cirrhosis. (*Id.*) The record suggests Defendants never obtained Martin's medical records, including the records related to his liver biopsy, from the Illinois prison where Martin was diagnosed.

---

[1]Martin's Complaint and Amended Complaint were "verified" by an affidavit attesting before a notary that the allegations in his pleadings were "true and correct." (Dkt. Nos. 2, 29.) Because Martin's complaints are "verified," they "may be used as an opposing affidavit under Rule 56" so long as they are "based on personal knowledge and set forth specific facts admissible in evidence." FED. R. CIV. P. 56, *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

FINDINGS & RECOMMENDATION - 3                                                    [RMD]

I.  Hepatitis Treatment at SRCI

In April 2008, Martin was transferred to SRCI, where he was treated by Chief Medical Officer at SRCI Garth Gulick, M.D. ("Dr. Gulick").  Dr. Gulick administered blood work on Martin and confirmed his diagnosis of HCV.  (Dewsnup. Decl. ¶ 15.)  Martin's medical records show that after he was transferred to SRCI, he received no medical treatment until October 2009.  (Dewsnup Decl. Ex. 1 at 6.)  However, from October 2009 to October 2010, when he was transferred back to OSP, Martin received phlebotomy treatment on a regular basis.  (Dewsnup Decl. Ex. 1 at 6-19.) Martin repeatedly requested changes in his treatment regimen, including pharmacological treatment for his HCV and a new liver biopsy to determine whether his cirrhosis had progressed since his last biopsy in 2003. (Plaintiff's Exhibit ("Pl.'s Ex.") 603; Response to Defendants' Motion for Summary Judgment ("Response") at 26.)[2]  Dr. Gulick denied Martin's request for treatment beyond the phlebotomies Martin received on a semi-regular basis.  (Dewsnup Decl. Ex. 1 at 1-19.)

II.  Cell Extraction and Subsequent Medical Care

On July 6, 2010, corrections officers forcibly removed Martin from his cell for allegedly aggressive behavior and failure to obey the commands of corrections officers (the "cell extraction"). On that day, Martin asked to speak to the lieutenant on duty about being denied food by corrections officers.  (Response at 8.)  After the officers on duty denied Martin's request, Martin covered the window to his cell with a blanket.  (*Id.*)  Officers ordered Martin several times to take the blanket off his window, but Martin did not comply. (Declaration of Albert W. Hazen ("Hazen Decl.") Ex. 1.)  A cell-extraction team met outside the cell and, after giving Martin a final warning, entered

---

[2]Martin's response is "verified" by an attestation clause at the end of his brief.  Thus, it may be used as an opposing affidavit under Rule 56.  *Johnson v. Meltzer*, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

Martin's cell.  (Hazen Decl. Ex. 1.)  During the cell extraction, corrections officers used "pain compliance" techniques, including deploying a shock shield and a taser, and administering several "knee strikes" to the back of Martin's leg.

Immediately after the cell extraction, Martin reported no injuries, but in the days that followed, the extent of his leg injury became apparent.  (Dewsnup Decl. Ex 1 at 9; Hazen Decl. Ex. 1.)  Two days after the cell extraction, he asked to see a doctor because his leg was so swollen he had difficulty sitting.  (Dewsnup Decl. Ex 1 at 10.)  Over the next few days, Martin was given ibuprofen, which Martin reported had little effect.  (*Id*.)  Martin became worried in the days that followed the extraction that the knee strikes had dislodged a metal rod which was implanted in his leg prior to being incarcerated.  (Response at 9.)  On July 13, 2010, seven days after the cell extraction, a nurse examined Martin's leg and was concerned that the bruising could lead to a blood clot and urged Dr. Gulick to examine Martin personally.  (*Id*. at 23; Dewsnup Decl. Ex. 1 at 10.)  However, Martin would not submit to restraints for transport to see Dr. Gulick.  (*Id*.)  Subsequently, an x-ray was performed, which was negative for any structural damage.  (*Id*. at 11.)

III.  Hallway incident

On September 19, 2010, Martin refused to relinquish the plastic wrappers for his lunch, as the wrappers were "considered contraband" after the food was removed from the wrappers.  (Pl.'s Ex. 390 at 1.)  Corrections Officer Payne asked Martin several times to give back the food wrappers, but Martin refused to comply, claiming they were the only surface on which he could eat his lunch. Martin began yelling insults at Officer Payne, prompting corrections officers to remove Martin from his cell and escort him to the segregation unit.  (Pl.'s Ex. 390 at 1.)  The parties disagree about what happened next, but both agree Payne pushed Martin up against the wall.  Defendants contend Payne

temporarily held Martin against the wall after Martin started thrashing around during transport. Martin alleges Payne, without prompting or justification, slammed Martin's head into the concrete wall. Eventually, Martin agreed to comply with Payne's directions and Martin was escorted to segregation for the remainder of the day. (Exhibit 390 at 1.)

IV.  Hepatitis Treatment at OSP

Martin was transferred to OSP in October 2010 and was treated by Dr. Dewsnup. (Dewsnup Decl. ¶¶ 16-17.) Again, Martin requested pharmacological treatment of his HCV and a liver biopsy. (*Id*. at ¶ 17.) The Therapeutic Level of Care Committee ("TLC committee"), who is tasked with reviewing requests for certain medical treatment on inmates, reviewed Martin's request to begin HCV treatment but recommended postponing drug treatment of Martin's HCV until 2011, when a new medication would be available. (*Id*. at ¶ 18.) In February 2011, Martin had an infection, which further delayed his candidacy for HCV treatment. (*Id*. at ¶ 21.)

In May 2011, Martin met with Dr. Dewsnup to further discuss drug treatment for Martin's HCV. (*Id*. at ¶ 24.) Dewsnup explained that, because of the genotype of Martin's HCV virus, it was unlikely he would have a high rate of response to HCV medication. (*Id*. at ¶ 15.) Regardless, Dewsnup agreed to prescribe Martin the HCV drugs Pegasys and Ribavirin. (*Id*. at ¶ 24.) Just months later, in July 2011, Martin's HCV medications were discontinued due to his behavior problems. (*Id*. at ¶ 28.) In January 2012, Dr. Dewsnup recommended Martin be prescribed Telaprevir, a different HCV drug, but the TLC committee denied the request, and concluded Martin could not receive treatment for his HCV until he demonstrated six months of "clear conduct." (*Id*. at ¶ 35.) Although Martin was approved to undergo an abdominal CT scan to rule out pancreatitis, he had yet to resume HCV medication when he filed his First Amended Complaint on April 24,

2012.  (*Id*. at ¶ 36.)

V.  Martin's Breathing Difficulty

On February 12, 2011, at around 2:30 P.M., Martin was admitted to the infirmary complaining of shortness of breath.  (Pl.'s Ex. 108.)  He showed no signs of productive cough but had "apparent shortness of breath."  (Pl.'s Ex. 108.)  At that time, his blood-oxygen saturation was around 93 percent.  (Pl.'s Ex. 108.)  The medical professional treating Martin wrote in his medical file, "[d]ue to [] shortness of breath [and] low $O_2$ sat[uration,] will place [patient] in infirmary on cot or observation until [appointment] with Dr. Vargo on 2/14/11."  (Pl.'s Ex. 108.)  At 4:00 PM that same day, Martin's oxygen saturation was 95 percent.  (Pl.'s Ex. 107.)

The following morning, Martin returned to the infirmary complaining of shortness of breath and dizziness which had persisted for the last ten-to-eleven days.  (Pl.'s Ex. 107.)  He reported he had been on a ventilator sixteen years prior for severe pneumonia, and was "very anxious" about his symptoms.  (Pl.s' Ex. 107.)  At that time, Martin's blood-oxygen saturation was at 94 percent.  (Pl.'s Ex. 107.)  Martin was given a nebulizer, ibuprophen, and a pass to return to the infirmary if his symptoms worsened.  (Pl.'s Exs. 107,164.)  At 10:20 P.M. later that evening, Martin again visited the infirmary.  (Pl.'s Ex. 107.)  He showed no indication of shortness of breath, but he did demonstrate mild symptoms of wheezing and his oxygen-saturation level was 91 percent.  (Pl.'s Ex. 107.)

On February 14, 2011, Martin again experienced shortness of breath and, because he had a "physician's pass," was permitted to go to the infirmary.  When he arrived he showed no signs of wheezing and no sign of respiratory distress.  (Pl.'s Ex. 110.)  His blood-oxygen level was 92 percent.  (Pl.'s Ex. 110.) After an examination, he was transported back to his cell.  Later in the day,

he again requested to visit the infirmary, but Officer Parker-Kent denied his request.  (Compl. ¶ 59.)

Martin visited the infirmary several times in the days that followed.  On February 16, 2011, Martin underwent a chest x-ray which showed possible signs of "sarcoid, lymphoma, or metastatic disease," but a subsequent CT scan revealed the abnormality to be scar tissue.  (Dewsnup Decl. Ex. 1 at 204-05.)  While being observed on February 18, 2011, Martin's blood-oxygen saturation ranged from 89 percent to 92 percent, but he exhibited no signs of labored breathing and was observed climbing "to third floor via stairs without difficulty."  (Gulick Decl. Ex. 2[3] at 27.)  Martin contends he had extreme difficulty climbing the stairs, and only did so because a guard denied his request to use the elevator.  (Resp. at 35-36.)

VI.  Conditions of Confinement at OSP

In late 2010 and early 2011, Martin worked in the OSP kitchen washing pots and pans. (Compl. ¶¶ 57-58.)  Because of his job duties, his clothes were "soaking wet" each day after his shift.  (*Id.*)  Martin had available to him a water-proof apron while he worked, but even when he wore the apron his clothes were wet, as the rubberized apron did not completely protect him from water.  (Declaration of Sean M. Harris ("Harris Decl.") ¶6; Response at 39.)  Martin was also unwilling to wear rubberized "rain gear" because it made him sweat profusely and would have left him wet with perspiration.  (Compl. ¶ 58.)

When Martin first arrived at OSP, he was issued "three pairs of pants, five t-shirts, and five sets of underwear," and was able to exchange clean clothing for dirty clothing after showers, after

---

[3]Defendants cite to "Attachment 1" to the Gulick Declaration when discussing Martin's breathing problems, but the relevant medical records are contained in "Attachment 2" to the Gulick Declaration.  The court construed the "Attachments" as exhibits and will cite to and discuss them as such.

work-shifts during the Monday through Friday work week, and "in emergency or unusual circumstances as needed."  (Harris Decl. ¶ 8.)  According to OSP policy, all inmates have available "at least one clean, full set of dry clothes at all times . . . ."  (*Id*.)  However, because Martin could not receive clean clothes on the weekend, he contends he had no extra set of clean clothes in his cell after work shifts.  (Resp. at 39.)

During the winter months, the cell house which contained Martin's cell was cold due to "inadequate" heating – so much so that guards in the cell house wore "jackets and earwarmers in the winter."  (*Id*. at 39-40.)  Because Martin had no access to clean, dry clothes, the cold conditions in his cell were exacerbated.  (*Id*. at 40.)  He asked Officer Harris and Officer Freeman for clean dry clothes, but both officers denied his request, and Officer Harris instructed other guards not to give extra clothes to prisoners, including Martin.  (Compl. at ¶¶ 57-58.)  Martin credits the cold weather and wet clothes for making him ill in February 2011.  (Compl. ¶¶ 57-58.)

## VII.  First Amendment Retaliation

In ODOC facilities, prisoners may raise grievances about the specifics of their condition by filling out and submitting a grievance form.  (Declaration of Jason Hanson ("Hanson Decl.") ¶ 6.) Inmates may grieve the following:

> (a) the misapplication of any administrative directive or operational procedure; (b) the lack of an administrative directive or operational procedure; (c) any unprofessional behavior or action which may be directed toward an inmate by an employee, contractor, or volunteer of the Department of Corrections or Oregon Corrections Enterprises; (d) any oversight or error affecting an inmate; (e) a program failure; (f) the loss or destruction of property; or (g) sexual contact, solicitation or coercion between an employee or contractor and an inmate.

(Hanson Decl. ¶ 7.)  An inmate may appeal an unfavorable grievance adjudication by completing a "Grievance Appeal form."  (Hanson Decl. ¶ 8.)

FINDINGS & RECOMMENDATION - 9                                                    [RMD]

During his time at both SRCI and OSP, Martin filed several inmate grievances, which Martin alleges led to retaliation from Defendants Palmer, Jennings, Hanson, and Hays. (Compl. ¶¶ 28-30, 34, 68, 84.) In July and August 2010, Palmer denied plaintiff a shower and once denied Martin's request to see a doctor about his leg injury. (*Id*. at ¶¶ 28-29.) Martin believes these actions were in retaliation for his use of the grievance procedure. (*Id*. at ¶¶ 28-29.) On August 9, 2010, after Martin had filed a grievance against Palmer, Palmer came to Martin's cell door and began yelling loudly within the hearing of other inmates about Martin's grievances. (*Id*. at ¶ 30.) "Writing grievances is considered as 'snitching by prisoners," and the prisoners in the cells around Martin's "began yelling rat, snitch, and profanities at [Martin]." (*Id*.) At around the same time, Hays made several "mocking" comments to Martin, including asking Martin "how's the leg?" after Martin's leg was injured during the July 6, 2010 cell extraction. (*Id*. at ¶ 34.) Hays also shook up Martin's meal tray on two occasions. (*Id*.)

From January 2011 to June 2011, after Martin was transferred to OSP, he was met with resistance from Hays when he asked for grievance forms. (*Id*. at ¶ 68.) When Martin would ask Hays for a grievance form, Hays would respond, "what do you need that for?" and "It's not gonna do you no good." (*Id*.) On June 22, 2011, Hays filed an inmate misconduct report against Martin for taking a shower at an unauthorized time and for disrespect after Martin called Hays "nothing but a punk bitch" in front of other inmates. (Declaration of Travis Hays ("Hays Decl.") ¶ 11.) Martin contends these misconduct reports are retaliatory. (Compl. ¶ 68.) During his time at OSP, Martin contends his grievances were not returned in a timely manner and were rejected in a retaliatory manner by Hanson, the grievance coordinator.

*Procedural Background*

Martin filed his claim *pro se* via verified complaint on December 21, 2011, against forty-eight defendants.  (Dkt. No. 1.)  His case was originally assigned to Magistrate Judge Dennis J. Hubel, with Judge Hernandez assigned as backup judge.  On the same day he filed his Complaint, Martin filed a motion for a temporary restraining order under Federal Rule of Civil Procedure 65 and requested the court order Defendants to immediately administer to Martin certain HCV medications.  (Dkt. No. 3.)  Martin also moved for the court to appoint him pro bono counsel.

In a January 4, 2012 order, Judge Hernandez denied Martin's motion for a temporary restraining order and motion for court-appointed pro bono counsel.  (Dkt. No. 8 at 16-18.)  Judge Hernandez also reviewed Martin's complaint sua sponte  pursuant to 28 U.S.C. §§ 1915 and 1915A and dismissed Martin's claims that: (1) were frivolous; (2) failed to state a claim for which relief could be granted; or (3) sought monetary relief against a defendant who was immune from such relief.  (Dkt. No. 8 at 3.)

In April 2012, Martin filed an Amended Complaint alleging largely the same claims against forty-five named defendants and eleven Doe defendants.  Martin also filed his Second Motion for a Temporary Restraining Order and Third Motion for Temporary Restraining Order.  (Dkt. Nos. 30, 31.)  In a May 7, 2012, Order, Judge Hernandez denied Martin's motions for a temporary restraining order and dismissed Martin's claims against twenty-four of the forty-five named defendants.  However, Judge Hernandez held that Martin's "complaint shall proceed against defendants Dewsnup, Gulick, Palmer, Nooth, Jennings, Payne, Randall, Shelton, Vargo, Hansen, Degner, Jones, Hays, Harris, Hanson, Hazen, Parker-Kent, Puerini, Snider, Smith, Sazie, Elliot, Premo, [and] Freeman," as well as several Doe defendants.  (Dkt. No. 33 at 13.)  In September 2014, Defendants

moved for summary judgment.  Martin filed a response and hundreds of exhibits in opposition to Defendants' motion.

*Legal Standard*

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the movant meets his burden, the nonmovant must "go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotation marks omitted).  Conclusory allegations which are unsupported by factual material such as affidavits and documentary evidence are insufficient to defeat a motion for summary judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

On summary judgment, the court is bound to view all facts in a light most favorable to the nonmovant and must draw all justifiable inferences in the nonmovant's favor.  *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).  Further, where the nonmoving party to a motion for summary judgment is a *pro se* litigant, the court must "construe liberally the filings and motions."  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

*Discussion*

Martin alleges that during his incarceration, Defendants violated his constitutional rights guaranteed by the First and Eighth Amendments.  First, Martin alleges Defendants demonstrated deliberate indifference to his serious medical needs in regards to: (1) his HCV and liver-cirrhosis

treatments; (2) the treatment for his leg pain resulting from the July 6, 2010 cell extraction; and (3) respiratory distress he experienced in February 2011.  Second, Martin alleges Defendants used excessive force during the July 6, 2010 cell extraction and the September 19, 2010 incident where Martin claims his head was "slammed" into a wall by an SRCI guard.  Third, Martin alleges he was subjected to unconstitutional conditions of confinement by being denied clean, dry, clothing and being forced to sleep in wet clothes in a cold cell.  Fourth, Martin alleges a First-Amendment retaliation claim because Defendants attempted to discourage him from using the inmate grievance process.

Defendants now request the court grant them summary judgment on all of Martin's claims. They contend that Martin cannot reasonably prove the objective or subjective elements of his deliberate indifference claims, that Martin was not subject to excessive force, and that Martin was not subject to unconstitutional conditions of confinement.  In addition, Defendants claim they are entitled to both sovereign and qualified immunity.  Finally, they argue Martin is statutorily precluded from collecting punitive damages and injunctive relief and cannot establish he suffered actual damages.

## I.  The Doe Defendants

Some of Martin's claims remain live against one or more Doe Defendants.  These Defendants have not been identified since this case was filed in December 2011, and the named Defendants do not present argument or evidence in favor of dismissing these claims.  Nonetheless, the court should dismiss Martin's claims against the Doe Defendants.

"As a general rule, the use of 'John Doe' to identify a defendant is not favored," in part because the Federal Rules of Civil Procedure do not authorize the use of "Doe" placeholders for

unidentified defendants. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980); *Craig v. U.S.*, 413 F.2d 854, 856 (9th Cir. 1969). But situations frequently arise where a plaintiff may have a valid cause of action against an individual whose identity is unknown. *Gillespie*, 629 F.2d at 642. "In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that the complaint would be dismissed on other grounds." *Id*.

Further, because Doe defendants are by their nature unidentified, they cannot be served properly under the Federal Rules of Civil Procedure. *See McLean v. Shelton*, No.3:11-cv-01535-AC, 2013 WL 3994760, at *8 (D. Or. Aug. 2, 2013). Rule 4(m) states that if "a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). If the plaintiff can demonstrate good cause for failing to serve the defendant, the court may extend the time for service, but absent good cause shown, the court may dismiss the plaintiff's claims. *McLean*, 2013 WL 3994760, at *8.

This case was filed in December 2011, and although the court set no deadline by which Martin was required to join claims and parties, discovery closed on September 18, 2014 (Dkt. No. 278) without Martin amending his complaint to identify any of the Doe Defendants. Martin had nearly three years to learn the identity of the Doe Defendants, substitute them as defendants, and serve them with process. Martin has not done so. Because Martin has failed to identify and serve the Doe Defendants despite ample opportunity to do so, the court concludes the Doe Defendants should be dismissed with prejudice.

II.  Eighth Amendment Cruel and Unusual Punishment

      The Eighth Amendment Provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  Despite the brevity and apparent simplicity of the Eighth Amendment, courts have recognized that Eighth Amendment claims may proceed on a variety of theories.  Three common theories of recovery under the Eighth Amendment are: (1) excessive force; (2) deliberate indifference to a serious medical need; and (3) unconstitutional conditions of confinement.  *See Hudson v. McMillan*, 503 U.S. 1 (1992) (excessive force); *Estelle v. Gamble*, 429 U.S. 97 (1976) (deliberate indifference); *Farmer v. Brennan,* 511 U.S. 825 (1994) (conditions of confinement).  Each variety of Eighth Amendment claim is subject to a different standard.  Here, Martin alleges claims under all three.

      *A.  Deliberate Indifference*

      Martin alleges Defendants were deliberately indifferent to several of his serious medical needs.  First, he contends that doctors at SRCI and OSP provided insufficient medical treatment for his HCV and liver cirrhosis.  Second, he alleges doctors were deliberately indifferent to the leg injury Martin suffered during the July 6, 2010 cell extraction.  Third, Martin alleges he was denied adequate medical care in relation to serious breathing difficulties he developed while he was housed at OSP.

      The Eighth Amendment requires prisons and jails to provide inmates with adequate medical care.  *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).  However, not all deprivations of medical care rise to the level of a constitutional violation.  *Id.*  "[M]ere medical malpractice, or even gross negligence, does not" constitute a constitutional violation.  *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).  Instead, there must be "a purposeful act or failure to act" by the prison

official, despite knowledge that the official's act or failure to act will likely cause the plaintiff harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992).

To be of constitutional significance, government employees tasked with providing medical care must show "deliberate indifference to serious medical needs of prisoners." *Id*. (quoting *Estelle*, 429 U.S. at 104). To succeed on a deliberate indifference claim, the plaintiff must show: (1) he or she suffered an objectively serious illness or injury while incarcerated; and (2) prison officials were subjectively aware of the prisoner's serious condition, but nonetheless delayed or denied access to adequate medical care. *Clement v. Gomez*, 298 F.3d 898, 904-905 (9th Cir. 2002). The first element is met "whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id*. at 904. Stated alternatively, to prove deliberate indifference in the Ninth Circuit, the Plaintiff must prove: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)

1. Hepatitis C Treatment

Martin alleges Defendants Dr. Gulick, Jane Doe #1, and Dr. Dewsnup demonstrated deliberate indifference to Martin's serious medical needs by failing to adequately treat his HCV and liver cirrhosis. Defendants move for summary judgment on these claims, arguing that Martin received regular and systematic treatment for his HCV. Thus, according to Defendants, Martin can prove neither the objective nor subjective elements necessary to succeed on a deliberate indifference claim. Defendants do not dispute HCV is a serious medical need, so the court will analyze only whether Defendants Gulick, Dewsnup, and Jane Doe #1 were deliberately indifferent to that serious medical need.

a. Gulick

Martin's first claim for relief ("Claim One") alleges constitutional violations which occurred while Defendant was housed at SRCI.  In both of Judge Hernandez's orders, he allowed Martin to pursue "Claim One" as "an Eighth Amendment Claim for the denial of adequate medical care." (Dkt. No. 8 at 5.)  However, Judge Hernandez determined Martin could not pursue Claim One as a "retaliation or due process claim," or as a claim under state law.  (Dkt. No. 5 at 4.)

Claim One alleges that, from April 2008 to October 2010, Dr. Gulick and Jane Doe #1 showed deliberate indifference toward Martin's serious medical need for HCV treatment. Specifically, Martin alleges Dr. Gulick refused to prescribe him "new drugs" designed to treat HCV and repeatedly declined Martin's request for a liver biopsy to study the progress of Martin's HCV and liver cirrhosis.  Martin also alleges that Jane Doe #1 violated his constitutional rights by failing to obtain a copy of Martin's September 15, 2003 liver biopsy despite being "given at least six medic[al] release" forms authorizing Defendants to obtain that information.  Jane Doe #1's failure to obtain Martin's old medical records "enabled . . . Dr. Gulick[] to delay and ultimately deny [Martin] medication to help prevent" further deterioration in his health.  (First Am. Compl. ¶ 19.)

Defendants move for summary judgment on Gulick's deliberate indifference claims regarding his treatment for HCV.  However, in their motion for summary judgment, defendants provide only a cursory discussion of Martin's HCV treatment by Dr. Gulick while he was housed at SRCI.  Further, the evidence Defendants submit contains little information about Dr. Gulick's treatment of Martin's HCV.  In the Declaration of Garth Gulick, Dr. Gulick does not directly rebut Martin's allegation that Gulick attempted "to convince plaintiff that he didn't have cirrhosis." Instead, Gulick states:

> Regarding Mr. Martin's claim that his request for liver biopsies have been denied: his labs and scans for [*sic*] to detect cirrhosis have been unremarkable, and if he in fact has cirrhosis, it can only be found in a liver biopsy report from July 2003.  It is true that Mr. Martin was receiving HCV treatment for almost a year (June 2012 to May 2013), through a combination of the medications Telaprevir, Pegasys, and Ribavirin.  However, that treatment was ultimately unsuccessful.  A new form of HCV treatment recently received FDA approval — so new that Oregon Health and Sciences University (OHSU) only very recently received approval to begin administering it.  ODOC expects to be formulating new HCV treatment protocols within the next one to two months.

(Gulick Decl. ¶ 6.)  He also states, in conclusory fashion and without citing to the record, that a review of Martin's medical records and chart notes "easily contradicts Mr. Martin's claim that [Gulick], or any member of ODOC's medical staff, have been 'indifferent' to [Martin's] medical needs."  (Gulick Decl. ¶ 8.)

The record demonstrates that Dr. Gulick was on notice Martin had been diagnosed with HCV and cirrhosis of the liver.  The very first page of Martin's ODOC medical records shows that on March 26, 2008, doctors noted a history "of Hep C . . . Cirrhosis . . . per old records."  (Gulick Decl. Ex. 2 at 1.)  The record shows Dr. Gulick ordered monthly phlebotomy, which entries appear on a regular basis in Martin's medical records, and ordered at least eight labs to measure the genotype and amount of ferratin in Martin's blood.  (Pl.'s Ex. 433-436; Gulick Decl. Ex. 2 at 105-109.)  Although the orders consistently note that prison officials "try to get Illinois [department of corrections] records," there is no indication on the record Dr. Gulick or anyone else at SRCI obtained a copy of Martin's 2003 biopsy results or made any effort to do so.  (Pl.'s Ex. 433, 436.)  Martin produced the report from his 2003 biopsy, which was procured by Dr. Dewsnup within two months of the date Martin was transferred to OSP.  The report confirms a diagnosis of "probable early cirrhosis (stage 4)."  (Pl.'s Ex. 1; Resp. at 26.)  Dr. Gulick declared in his affidavit that he decided not to order a new liver biopsy or otherwise treat Martin's cirrhosis because "his labs and

scans for to detect cirrhosis have been unremarkable." (Gulick Decl. ¶ 6.)

The ODOC guidelines for treating HCV that were in place while Dr. Gulick treated Martin recommend that, within ninety days of a patient's arrival or request for testing, ODOC physicians do a full "noninvasive evaluation" including antibody tests, work-ups for liver enzymes and HCV antibody tests, a full medical history, and "complete chemistry panel." (Gulick Decl. Ex. 3 at 3-8.) "A full evaluation can also include looking for evidence of severity of disease, evaluation of other medical conditions, and other contraindications to treatment." (Dewsnup Decl. ¶11.) Moreover, "[a]ll patients with HCV infection are offered further evaluation in order to see if they are potential candidates for treatment; however, the initial individual evaluation may find treatment to not be appropriate for the individual patient." (Dewsnup Decl ¶ 12.)

The record shows Dr. Gulick performed an individualized evaluation which did not show deliberate indifference to Martin's serious medical need. Although Dr. Gulick failed to obtain the 2003 biopsy report, he performed regular labs and phlebotomies which showed no remarkable progress of Martin's HCV. Because the tests Dr. Gulick performed showed no significant worsening of Martin's symptoms, his refusal to start Martin on a drug regimen did not constitute deliberate indifference to Martin's HCV. Dr. Gulick followed ODOC regulations by monitoring Martin's HCV and did not show deliberate indifference to Martin's serious medical need.

### b. Dr. Dewsnup

Dr. Dewsnup also moves for summary judgment., He argues Martin received "extensive HCV treatment" exceeding community standards while he was incarcerated at OSP, and thus it cannot give rise to an Eighth Amendment claim. The court agrees, and recommends summary judgment in Dr. Dewsnup's favor.

FINDINGS & RECOMMENDATION - 19                    [RMD]

Dr. Dewsnup is a physician specializing in internal medicine and infectious diseases. (Dewsnup Decl. ¶ 1.) He currently works as a "Corrections Physician Specialist" at OSP. Dr. Dewsnup submitted a declaration which thoroughly describes his treatment of Martin during his incarceration at OSP. Dr. Dewsnup first examined Martin on November 30, 2010. (*Id*. at ¶ 17.) At that appointment, Martin made known his interest in receiving pharmaceutical treatment for his HCV. However, Martin's HCV had a "genotype 1a indicating [Martin] <u>will</u> have a poor rate of response to HCV medication treatment." (*Id*. at ¶ 15) (emphasis original). Nonetheless, Dewsnup referred Martin's request to the Therapeutic Level of Care Committee ("TLC") for review.

The TLC deferred approving Martin's treatment in anticipation of new drugs being approved for HCV treatment in 2011. Thereafter, Martin's treatment was further delayed when Martin suffered a mild infection. In May 2011, Dewsnup prescribed Martin HCV medications Pegasys and Ribavirin. Dr. Dewsnup also prescribed Martin gabapentin, a mood stabilizer designed to counter the psychological side effects commonly associated with HCV treatments. (*Id*. at ¶ 24.) However, in July 2011, Martin began refusing to eat meals and take his mood stabilizing medication. (*Id*. at ¶ 28.) Because of Martin's behavior, Dr. Dewsnup discontinued Martin's HCV treatment on July 21, 2011. (*Id*.)

Although Martin's drug treatment was suspended, Dr. Dewsnup continued to pursue other treatment options. (*Id*. at . ¶¶ 32-36.) Dr. Dewsnup ordered an ultrasound and a CT scan of Martin's abdomen. (*Id*. at ¶¶ 33, 36.) He also referred Martin's renewed request for HCV medication to the TLC, who denied the request because the committee required at least six months of "clear conduct." (*Id*. at ¶ 35.) Martin demonstrated a period of good behavior, and Dr. Dewsnup prescribed Pegasys, Ribavirin, and Telaprivir to treat Martin's HCV in June 2012. (*Id*. at ¶ 38.) Martin completed his

HCV treatment in May 2013, but labs indicated "the treatment was unsuccessful." (*Id*. at ¶ 48.) Although Dr. Dewsnup has considered a new round of treatment with different medications, those medications are not currently FDA-approved to treat Martin's strain of HCV. (*Id*. at ¶ 52.)

The record demonstrates that Dr. Dewsnup administered to Martin extensive HCV treatment while Martin was housed in OSP. Each time Martin requested an HCV treatment regimen, Dr. Dewsnup forwarded his request to the TLC. Further, in periods during which the TLC denied or deferred Martin's treatment, Dr. Dewsnup administered diagnostic tests and internal imaging to monitor Martin's condition.

Martin argues that Dr. Dewsnup was nonetheless deliberately indifferent because he refused Martin's requests for a liver biopsy, which had not been performed since 2003. However, Dewsnup obtained the diagnostic documents from Martin's previous biopsy, was aware of the severity of Martin's HCV, and administered a series of treatments to help cure it. There is no evidence that a new liver biopsy would have Dr. Dewsnup's aggressive treatment of Martin's HCV and cirrhosis. Without evidence his treatment would have or should have changed after a new biopsy, Martin cannot demonstrate he suffered injury.

Moreover, A prisoner's disagreement with his or her physician regarding the appropriate course of diagnostic tests or treatment does not give rise to an Eighth Amendment claim. *Sanchez v. Vild*, 891 F.2d 240, 242Because no genuine issue of material fact exists and no reasonable factfinder at trial could conclude Dr. Dewsnup showed deliberate indifference for Martin's medical need, the court should grant summary judgment in Dr. Dewsnup's favor.

### 2. Treatment of Leg Pain

Martin brought claims against Dr. Gulick and Dr. Vargo for deliberate indifference to

Martin's leg pain.  Defendants contend Martin cannot demonstrate SRCI and OSP employees

showed deliberate indifference to Martin's serious medical need in relation to Martin's leg pain.

Martin argues that his claims should proceed because he immediately informed Defendants of his

leg pain and for years following, Defendants did little to nothing to treat his injury.  The court

concludes that, although his leg injury was objectively serious, Martin does not demonstrate a

genuine issue of fact on whether Defendants were deliberately indifferent to his leg injury.

### a. Serious Impairment

The court concludes Martin's leg pain is a "serious medical need" as defined under the law.

Although at first his leg pain appeared routine, albeit significant, it should have become apparent

to prison officials after years of pain complaints that something was wrong with Martin's leg.

Martin introduced reports and recommendations of Dr. Randolph E. Peterson, M.D. ("Dr.

Peterson"), who examined Martin for his leg-pain complaints.  (Pl.'s Ex. 605.)  Dr. Peterson

explained that the rod previously implanted in Martin's left leg "does appear to impinge to the lateral

soft tissue."  (*Id*.)  Dr. Peterson recommended Martin undergo hip replacement on his left side upon

authorization from prison officials.  (Pl.'s Ex. 606 at 2.)  Dr. Peterson's report is dated March 2014.

Thus, it is not probative of the subjective element of Martin's claim, but along with Martin's medical

records and repeated complaints of leg pain, demonstrates that Martin's leg condition has and will

continue to result in "wanton and unnecessary" pain and suffering.  Therefore, the next inquiry any

Defendant demonstrated a deliberate indifference to this serious condition.

### b. Dr. Gulick

Martin contends Dr. Gulick was deliberately indifferent because he did not examine Martin's

leg in the days following the cell extraction and did not prescribe Martin any pain medication

beyond ibuprophen.  During the July 6, 2010 cell extraction, one of the SRCI officers administered several knee strikes to the back of Martin's leg to gain his compliance.  In the video taken of the cell extraction, Martin can be heard complaining about the pain caused by the knee strikes and later complaining that his leg hurt.  However, the intake chart completed following the extraction indicates Martin did not report an injury during the extraction.  (Gulick Decl., Ex. 2 at 9.)

Two days later, Martin was seen by medical personnel at his cell door, where he complained that his leg was bruised and swollen and that "it hurt[] to sit down."  (*Id*. at 9.)  Martin was prescribed ibuprophen for the pain and swelling.  Later that day, Martin complained that the ibuprophen wasn't working.  At that point, Defendants administered Naproxen.  A full week after the cell extraction, Martin continued to complain of pain and swelling in his leg.  He was seen by a nurse who, according to Martin, was concerned about Martin being at risk for a blood clot.  She wrote in Martin's medical record "Dr Gulick: left leg swollen please see."  But when SRCI personnel prepared to transport Martin to see Dr. Gulick, Martin became irate.  He began "rambling [and] cussing" and he refused to submit to the restraints necessary for him to be transported to see Dr. Gulick.  (Gulick Decl., Ex. 2 at 10.)  As a result, Martin did not see Dr. Gulick on that day.  Over the days and weeks that followed, Martin underwent x-ray imaging of his leg, which was negative for a fracture.  (Gulick Decl. at ¶ 5.)

Until he was transferred to OSP in October 2010, Martin consistently complained of leg pain. On several occasions, he expressed his worry to medical providers that his leg pain resulted from a problem with a steel rod in his leg.  Despite his pain, however, Martin was observed doing "step-up" exercises in his cell.  Further, at a nearly all of his doctor appointments, Martin had "good sit, stand and gait."  (Gulick Decl. Ex. 2 at 17.)  Before he was transferred to OSP, Martin complained

of "clicking" and "grinding" sensations in his hip and requested treatment by a specialist. (Dewsnup Decl. Ex. 1 at 345.)  The TLC reviewed Martin's request but determined that because of Martin's negative x-ray and ability to perform "step-ups" demonstrated there was "[zero] medical need to see [a] specialist."  (*Id*.)

The court concludes Martin does not demonstrate a genuine issue of material fact regarding whether Dr. Gulick was deliberately indifferent to Martin's leg pain.  Dr. Gulick saw Martin regarding his leg pain on several occasions in the months following the cell extraction and observed his gait as normal.  Dr. Gulick also ordered x-rays, which were negative for any major skeletal injury. Finally, given reports that Martin was performing "step-up" exercises shortly after suffering leg injury and Martin's refusal to take the nonsteroidal anti-inflammatory medications he was prescribed, there is no evidence Dr. Gulick was deliberately indifferent to Martin's injury.  Because Martin cannot prove the subjective element of his claim, the court should grant Dr. Gulick summary judgment.

### c.  Dr. Vargo

Martin alleges that Dr. Vargo showed deliberate indifference to his serious leg injury by failing to prescribe him medication and refusing Martin's requests to see a specialist about his leg pain.  However, like Dr. Dewsnup, Dr. Vargo had access to Martin's medical records which showed: (1) Martin was seen doing "step-ups" in his cell following his leg injury; (2) underwent an x-ray which showed no significant structural damage; and (3) refused to take the pain medications Martin's doctors prescribed.  Based on this information, Vargo's refusal to prescribe Martin stronger pain medication did not demonstrate deliberate indifference to Martin's serious medical need.

Martin does not demonstrate he is entitled to pursue his claims against Dr. Vargo.  In his

response to Defendants' Motion for Summary Judgment, Martin's only reference to Vargo's alleged deliberate indifference is one sentence: "Defendant refused plaintiff's request for . . . pain medication." Martin does not cite to portions of the record which would create a genuine issue of material fact on his deliberate indifference claim against Dr. Vargo. Thus, the court should grant Dr. Vargo summary judgment.

### 3. Breathing Problems

Martin alleges Defendant Parker-Kent was deliberately indifferent to the significant risk posed by Martin's respiratory distress. Defendants move for summary judgment and contend Martin cannot establish the objective or subjective components of his deliberate indifference claim.

Martin's allegations against Parker-Kent involve two incidents on February 14, 2011, where Martin requested he be taken to the infirmary because of breathing issues. He alleges that an OSP Guard, "Miss Berriman" discovered him gasping for air on the morning of February 14, 2011. Miss Berriman permitted Martin to go to the infirmary after consulting with Parker-Kent. Later that same day, Martin continued to have breathing difficulties and asked to go the infirmary because he was "in fear for his life." (Second Am. Compl. ¶ 59.) When he asked again to go to the infirmary, Parker-Kent denied the request. Martin contends this demonstrated deliberate indifference to a serious medical need.

Although it is clear Parker-Kent was deliberately indifferent to what seemed at the time to be a serious medical issue, Parker-Kent is entitled to summary judgment. Parker-Kent refused Martin's request to go to the infirmary, despite martin's "physician's pass" allowing him to do so whenever his breathing was labored. Moreover, Defendants do not prove through expert testimony that there was no objective risk to Martin's health posed by his blood-oxygen saturation level at the

time, which was between 89% and 92%. Further, the medical tests taken after the date in question were troubling, as they suggested "sarcoid lymphoma or metastatic disease" or "moderate bihilar lymphadenopathy."

However, Martin produces no evidence or allegations that he suffered significant harm as a result of Parker-Kent's deliberate indifference. This case has facts in common with *Chandler v. Hammons*, No. 2:11-cv-1969 JAM CKD P, 2013 WL 3149245 (E.D. Cal. June 19, 2013), a case from he Eastern District of California. The plaintiff in *Chandler* was a prisoner incarcerated in the a California State Prison. *Id*. at *1. He suffered from asthma, for which he had been treated in the prison infirmary. He had been prescribed several asthma medications, including an albuterol inhaler. *Id*. at *3. One day, while in his cell, the plaintiff informed a guard he was having trouble breathing. The guard relayed the information to the infirmary who told the guard not to let the plaintiff visit, but to have the plaintiff fill out a medical-treatment request form and allow the plaintiff to visit the prison clinic when the next shift of prisoners was allowed in the recreation yard. *Id.* Soon, the plaintiff's symptoms worsened and he began having an asthma attack. *Id*. Medics were called, and the plaintiff was taken to the infirmary on a gurney. *Id.* at *4. More than two hours passed between Plaintiff's original breathing problems and when he received treatment in the infirmary. *Id*. The plaintiff filed suit under § 1983, but the district court granted Defendant's motion for summary judgment. *Id*. at *6. The court reasoned that plaintiff could not prove the necessary elements of his deliberate indifference claim because he could not prove the delay caused the plaintiff "significant harm."

The facts here are similar. Although medical tests in the days immediately following Martin's breathing problems indicated the possibility of a serious problem with Martin's lungs, the

abnormality in Martin's medical imaging turned out to be mere scar tissue, and there is no evidence Parker-Kent's actions caused Martin any lasting harm. Because Martin cannot prove he suffered serious harm, he cannot prove the objective element of his claim. Thus, Parker-Kent is entitled to summary judgment.

### B. Excessive Force

Martin alleges excessive use of force against by Defendants Jones, Hazen, Nooth, and Payne. His allegations are premised on two separate incidents in 2010. First, Martin alleges he suffered injuries due to the Defendants' excessive force during the July 6, 2010 cell extraction. Second, Martin alleges Defendant Payne used excessive force on September 19, 2010, by slamming Martin's head into a brick wall. Defendants move for summary judgment on both of Martin's excessive-force claims.

The Eighth Amendment's prohibition against cruel and unusual punishment extends to the prohibition of the use of excessive force by prison officials. *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003). "The Court's settled rule is that the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1 (1992)) (internal quotation marks and brackets omitted). However, prisons can be violent places, and prison officials must occasionally use force to keep order. *Hudson*, 503 U.S. at 6. When force is used to keep order in the face of "a riot or a lesser disruption, corrections officers must balance the need to 'maintain or restore discipline' through force against the risk of injury to the inmates." *Id.* Stated alternatively, "whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the

very purpose of causing harm." *Id*.

When determining whether the Defendant used excessive force, the court analyzes: "(1) the extent of the injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that needed and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response." *Id*. In undertaking this analysis, the court should afford prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*, 503 U.S. at 6.

### 1. The July 6, 2010 Cell Extraction

Martin alleges Defendants Hazen, Nooth, Jones, and the Doe Defendants used excessive force during the July 6, 2010 cell extraction. In particular, Martin contends that after Defendants opened his cell door, he immediately complied with their orders by laying down and putting his hands behind his back. Thus, according to Martin, Defendants' use of knee strikes and a "shock shield" to gain compliance was unnecessary and excessive. Defendants contend Hazen and Jones are entitled to summary judgment because any force they exercised during the cell extraction was applied in good faith for the sole purpose of restoring order and ensuring Martin's compliance with legitimate orders by prison personnel. In addition, they contend Nooth did not personally participate in the cell extraction and cannot be held liable under a supervisory-liability theory.

#### a. Jones

During the cell extraction, Defendants had a difficult time getting one of Martin's hands behind his back. To gain compliance, Jones used a series of "knee strikes" to the back of Martin's leg. This caused significant pain and bruising, and aggravated a preexisting leg injury. Defendants

argue Jones's use of force was consistent with ODOC policies and did not constitute excessive force. Compliance with policies is not dispositive in Defendants' favor, as a constitutional violation could still occur despite a Defendant's strict adherence to an official rule or regulation.  However, given the latitude prison officials are given when crafting and applying policies, compliance with a policy is evidence of compliance with the Eighth Amendment's requirements.

Analysis of the five-factor test shows Jones's use of force was not excessive.  First, although Martin incurred an injury which has led to long-term pain, his injuries were not permanently debilitating or life-threatening.  Second, Defendants established the force was reasonably necessary to gain Martin's compliance.  Martin refused to comply with the Defendants' orders to uncover his cell window, then refused to put his hands through the port to be cuffed.  Martin gave members of the cell-extraction team no reason to believe he would comply with their orders once officers opened his cell door.

Third, and similar to the second factor, the members of the cell-extraction team reasonably perceived a threat.  Martin was uncooperative with officers and acted in a manner which reasonably led them believe he would be violent after the cell-extraction team entered the cell.  After they entered, they employed compliance techniques only after Martin refused to put his hands behind his back.  Martin contends a member of the cell-extraction team was holding down his hand, and he was unable to put it behind his back.  For Martin to create a genuine issue of material fact on whether Defendants exercised force in good faith, he must introduce evidence suggesting Jones subjectively knew Martin was unable to comply with his orders and still administered the knee strikes.  The record does not contain evidence showing Jones knew Martin's hand was being held down by another member of the cell-extraction team.  Thus, Jones reasonably perceived a threat and acted

accordingly.

Fourth, the amount of force used was proportional to the threat posed. By refusing to remove the bed sheet from his cell window and refusing to submit to restraints, Martin showed an unwillingness to submit to lawful authority. In the face of this defiance Defendants administered non-deadly force, which eventually gained Martin's compliance. Fifth, the Defendants took efforts to temper the severity of the force used. The force Defendants administered during the cell extraction was necessitated by Martin's noncompliance with prison rules followed by his refusal to submit to restraints. Defendants attempted to resolve the issue without entering Martin's cell, but Martin's noncompliance with their orders ultimately required the cell extraction.

The final factor weighs in neither party's favor. Although Defendants reasonably perceived some threat from an agitated, noncompliant prisoner, Martin laid down on the ground with his hands to his side as soon as the cell-extraction team opened Martin's cell door. Thus, it is questionable whether a reasonable prison official would have perceived a serious threat to his or her well-being. Regardless, four of the five *Hudson* factors weigh in Defendants' and no reasonable factfinder at trial could conclude Jones's use of force was unconstitutional. Therefore, Jones is entitled to summary judgment.

### b. Hazen

Martin contends that Hazen, the supervising officer at the time of the cell extraction, "could have prevented the cell extraction from . . . taking place" and should have prevented Jones from administering unconstitutionally excessive force. However, the court already concluded Jones did not violate Martin's constitutional rights through use of force. "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the

constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted). A sufficient causal connection exists where the defendant "knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Here, Martin does not allege Hazen himself engaged in any unconstitutional conduct. Moreover, Hazen cannot be held liable under a supervisory liability theory because the court already concluded the Defendants did not administer excessive force during the July 6, 2010 cell extraction. Thus, Hazen cannot be held liable under § 1983 and is entitled to summary judgment.

### c. Nooth's Failure to Prevent Violations

Martin does not allege Nooth was personally involved in the July 6, 2010 cell extraction. Instead, Martin contends Nooth is liable for the constitutional violations incurred during the cell extraction because Nooth, as warden of SRCI, was aware of the constitutional deprivations and failed to prevent them. In support of his claims, he introduces into evidence two inmate communication forms complaining about the excessive force during the July 6, 2010 cell extraction. (Pl.'s Exs. 62-63.) Both of these forms post date the cell extraction, however. If Nooth became aware of the allegedly unconstitutional conduct after it occurred, he could not have intervened to prevent those constitutional violations. The evidence does not support Martin's theory that Nooth is liable, and the court should grant summary judgment in Nooth's favor.

### 2. September 19, 2010 Hallway Incident

Martin also alleges Defendant Payne used excessive force when he choked Martin and slammed his head into a brick wall while Martin was in full restraints. Defendants move for summary judgment Martin's claims against Payne, contending Payne's use of force was wholly

justified.  There exists a genuine issue of material fact which precludes summary judgment.

First, the parties disagree over what actually occurred on September 19, 2010.  Martin contends Payne choked him and slammed his head into a concrete wall.  Payne, conversely, explained in his declaration that he "held Inmate Martin against the wall for a few moment [sic] until Inmate Martin agreed to comply with staff directives."  (Payne Decl. ¶ 4.)  Second, the parties disagree about what conduct, if any, prompted Payne to exercise force.  Martin contends Payne administered force after Martin refused to return his food wrappers to Defendants.  Defendants assert Payne administered force after Martin jerked his head about in an aggressive manner and threatened physical violence.  These facts are material to the court's analysis of the five-factor *Hudson* test.  Because genuine issues of material fact exists, the court should not grant Payne summary judgment on this claim.

### C. Unconstitutional Conditions of Confinement

As part of his incarceration program, Martin was required to work in the kitchen washing and drying pots and pans five days per week.  Martin alleges that on the weekends Defendants refused to issue him dry clothes.  According to Martin, he was forced to wear wet clothes at night from October 2010 through June 2011, even during the winter when guards in his cell block "wear jackets and ear warmers" to stay warm.  Martin alleges his Eighth Amendment rights were violated when OSP guards refused to issue him clean, dry clothes after his weekend work shifts.

Prisoners have an Eighth Amendment right to be free from cruel and unusual conditions of confinement.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Like other Eighth Amendment claims, the plaintiff is required to prove an objective element and a subjective element to succeed in his or her claim.  To demonstrate the objective element, the plaintiff must show he or she was confined in

a manner which caused more than "routine discomfort." *Wilson v. Seiter*, 504 U.S. 294, 298 (1991). The Supreme Court has repeatedly held that the Constitution "does not mandate comfortable prisons" *Id*. Thus, prison conditions are actionable under the Eighth Amendment where they deny a prisoner one or more of "the minimal civilized measure of life's necessities." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (2001)). Specifically, prison officials have a duty to ensure prisoners are provided with the necessary "identifiable human need[s] such as food, warmth, []exercise," and personal safety. *Wilson*, 504 U.S. at 304, *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

To establish the subjective prong, the plaintiff must demonstrate  that prison officials were deliberately indifferent to the inhumane conditions experienced by the plaintiff. *Wilson*, 504 U.S. at 303.  Therefore, prison officials can be held liable under a "conditions-of-confinement" theory only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  Awareness of a particular risk may be proven merely "from the very fact that the risk was obvious." *Id*. at 842.  Both prongs of the test must be analyzed "with due regard for . . . the kind of conduct against which an Eighth Amendment objection is lodged." *Wilson*, 501 U.S. at 302. The court must consider the circumstances, nature, and duration of the deprivation when determining if it violates the constitution.  *Id*.

### 1. Serious Deprivation of Rights

Martin alleges that after each shift washing pots and pans in the prison kitchen, his clothes were "soaking wet."  After his shifts, Martin requested he be issued a set of dry clothes because temperatures in his cell block were very cold during the winter.  Despite his request, prison officials were instructed not to give "extra" clothing to inmates.  Because he had no choice but to wear wet

clothes in a cold cell block, he was denied warmth and dry clothes, which he contends are "minimal civilized measure[s] of life's necessities."  Martin also alleges he became ill as a result of these conditions.

Defendants first contend that Martin was issued "multiple sets of clothing" and at all times had at least one set of clean clothes available to him.  In support, Defendants introduce the declaration of Sergeant Sean M. Harris ("Harris"), who testified that "[a]ll inmates are given three pairs of pants, five t-shirts, and five sets of underwear upon their arrival at OSP."  (Harris Decl. ¶ 8.)  According to Harris, inmates may exchange dirty clothing for clean clothing: (a) after shower periods; (b) after work shifts occurring on Monday through Friday; and (c) "in emergency or unusual circumstances, as needed."  (Harris Decl. ¶ 8.)  Martin concedes that he was issued three pairs of pants and five t-shirts when he arrived at OSP and was given one full set of clothes after his shower periods.  He also testifies in his verified brief that he never had a set of dry clothes available to him after work on weekends.  Although Martin's response is difficult to track and at times disorganized, the court is not tasked with weighing evidence or assigning credibility at this stage.  Instead, the court must view all factual disputes in Martin's favor.  Thus, there is a genuine issue of material fact as to whether Martin had dry clothes available to him following his weekend shifts.  If Martin truly was required to wear wet clothes at night during the winter months, there was an objective serious risk of harm that Martin was exposed to cold temperatures while wearing wet clothes.  Therefore, he ran a serious risk that he would be deprived "warmth" as required by the Constitution.

Second, Defendants contend Martin was not denied the basic necessities of civilized society because he declined an opportunity to wear waterproof gear during his shift at the kitchen.  Thus, Martin's actions, and not the actions of the Defendants, caused Martin to wear wet clothes for days

on end during the winter of 2010-2011.  It is unclear from the record whether Martin attempted to use the "rain gear," but Martin argues it would have been of no use.  According to Martin, the rubber rain gear causes the wearer to sweat profusely, so even had he worn the protective clothing during his work shift, his clothes would still be wet after work.  The points raised by each show there are also genuine issues of material fact regarding the causal element of Martin's claim.  Defendants' evidence and arguments do not patently disprove Martin's allegations that he was required to wear wet clothes overnight during the winter months.

Third, Defendants argue that, even assuming the truth of Martin's allegations, he fails to show that wet clothing rises above the level of routine discomfort inherent in the prison setting. They contend wearing wet clothes does not deprive a prisoner of the minimal civilized measure of life's necessities.  However, Defendants do not cite authority for this proposition.  Martin alleges not just that he was required to wear wet clothes, but that these conditions persisted overnight, during the winter months, in a cell block that was "insufficiently heated" to the extent guards wore "jackets and ear warmers" when on duty.  The Supreme Court has held that "warmth" is one of the basic necessities ensured to prisoners by the Eighth Amendment.  *Wilson*, 501 U.S. at 504 (prison conditions violate the constitution where "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.").  The *Wilson* court even noted as an exemplar of unconstitutional prison conditions "a low cell temperature at night combined with a failure to issue blankets."  *Id*.  The court's example in *Wilson* would be of identical effect had it substituted the phrase "wet clothing" for "failure to issue blankets."  Thus, Martin adequately demonstrates that having soaking wet clothes during the winter months could give rise to a violation of his Eighth Amendment rights.

Finally, Defendants contend Martin cannot succeed on this claim because he erroneously alleges he became "ill enough to be transported to an outside facility." Defendants, through affidavits and evidence, make a strong showing that Martin was never taken to an outside medical provider during the time period at issue. However, this fact is irrelevant and does not entitle Defendants to summary judgment. Whether or not Martin became sick as a result of spending nights in an inadequately heated cell block in wet clothes does not change the court's analysis. Here, Defendants do not adequately demonstrate that they are entitled to summary judgment.

### 2. Subjective Knowledge

Defendants next argue Martin cannot demonstrate Harris and Freeman acted with a culpable mental state. Specifically, Defendants contend "that wet clothing does not constitute an 'excessive risk' to inmate health or safety," particularly because Martin was offered a waterproof apron to keep his clothes. The court concludes that questions of material fact remain, and Defendants are not entitled to summary judgment on Martin's claim for unconstitutional conditions of confinement.

First, Defendants do not cite to any evidence supporting their argument that Freeman had no subjective knowledge of the allegedly constitutional conditions. Second, to the extent Defendants produce evidence Harris lacked actual knowledge of the unconstitutional condition, Martin advances evidence to create a genuine issue a material fact. Defendants contend Harris lacked a culpable mental state because, according to the "schedule" for clothing exchange, Martin should have had a spare set of dry clothes available after his work shift. Martin testified through his verified response that, on multiple occasions, Defendants denied requests for additional clothing after his weekend shifts in the prison kitchen. Martin also declared in his verified response that Harris ordered guards to search Martin's cell for extra clothing. This evidence tends to show that

Martin did not have dry clothing available to him after work shifts on the weekends.

Harris had knowledge that Martin had wet clothing after his weekend shifts. Martin contends Harris also had knowledge that the cell block in which Martin was housed had inadequate heating. There is an obvious risk involved when a person is required to wear wet clothes in the wintertime in an area that is inadequately heated. Because the risk is obvious, the court concludes there is a genuine issue of material fact regarding whether Harris and Freeman had actual knowledge of the constitutional deprivation. Therefore, the court should deny Defendants motion for summary judgment on this claim.

### III.  First Amendment Retaliation

Martin alleges First Amendment retaliation against Defendants Palmer, Jennings, Hanson, and Hays. Defendants move for summary judgment on all four counts of First Amendment retaliation. Martin does not respond to Defendants' arguments in favor of summary judgment except to challenge Defendant's version of the facts as stated in the Hanson Declaration.

A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives to the corrections system." *Silva v. Di Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2010). Included among those rights guaranteed by the First Amendment is the right "to petition the government for redress of grievances without retaliation." *Id*. To succeed on a claim for First Amendment retaliation, a plaintiff must prove: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took an adverse action against the plaintiff; (3) a causal connection exists between the plaintiff's conduct and the defendant's adverse action; (4) the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities[;]" and (5) the defendant's retaliatory action did not advance the legitimate

penological goals of the correctional institution. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). The defendant's adverse action "need not be an independent constitutional violation. The mere threat of harm may be an adverse action . . . ." *Id.* (citations and internal quotation marks omitted).

A. *Hanson*

Martin contends Hanson committed First Amendment retaliation by: (1) trying to dissuade Martin from using the grievance process; (2) failing to properly process Plaintiff's grievances on at least three occasions; (3) failing to timely respond to plaintiff's grievances; and (4) denying plaintiff the opportunity to submit grievances and grievance appeals. In Hanson's declaration, he summarizes the thirty-eight grievances Martin filed between October 2010 and December 2011. Hanson goes on to deny he retaliated against Martin for filing grievances. He declares that:

> At no time did I ever dissuade Inmate Martin from using the grievance process. All grievances received from inmate Martin were processed according to OAR 291-109. At no time did I ever deny inmate Martin the opportunity to submit a grievance or grievance appeal. At no time did I ever deny inmate Martin the opportunity to submit a grievance or grievance appeal. . . . Without [] specifying which grievances inmate Shawn Martin is referring to I am unable whether [*sic*] I failed to timely respond. However, I rely on my foregoing summary of responses to Inmate Martin's grievances set forth above.

(Hanson Decl. ¶ 49.)

In Martin's declaration in opposition, he contends Hanson's list of grievances in the Hanson declaration is non-exhaustive. Specifically, Martin contends Hanson "illegally denied" several grievances and grievance appeals Martin filed against the TLC. In support, Martin cites Plaintiff's exhibits 55-60. Plaintiff's exhibits 55-60 are documents related to Martin's February 5, 2012 grievance against the TLC for denying Martin pharmacological treatment for his HCV. (Pl.'s Ex. 55.) Hanson denied Martin's grievance because, under Oregon Administrative Rules, an inmate

FINDINGS & RECOMMENDATION - 38                                              [RMD]

cannot grieve "claims or issues that the inmate is pursuing in pending litigation in state or federal courts." (Pl.'s Ex. 56.) Martin appealed the denial of his grievance, which was also denied. (Pl.'s Exs. 57-58.) Finally, Martin filed a grievance against Hanson for denying his February 5, 2012 grievance against the TLC. (Pl.'s Ex. 59.) Hanson construed this grievance as a second appeal of Martin's original grievance against the TLC, and denied it, again based on the limitations on inmate grievances contained in OAR 291-109-0140(3).

Martin does not create a genuine issue of material fact on the causal element of his First Amendment retaliation claim. In his declaration, Hanson categorically denies retaliating against Martin for filing and appealing inmate grievances. Moreover, he clearly demonstrates that he rejected the relevant grievances because the subject matter raised therein was identical to the subject matter in certain lawsuits Martin filed. Thus, Hanson denied the grievances because he was required to by Oregon law, not because Martin exercised his First Amendment rights. Martin does not rebut this testimony. Therefore, Martin cannot prove the causal element of his First Amendment retaliation claim as against Hanson, and the court should grant Defendants summary judgment.

### B. Palmer

Martin alleges Palmer violated his First Amendment rights by: (1) denying him a shower; (2) verbally harassing him; and (3) denying him medical care on June 24, 2010. Defendants contend that denial of a single shower and one incident of verbal harassment would not silence a person of ordinary firmness from exercising his or her First Amendment rights, and thus cannot give rise to a claim for retaliation. In addition, they contend prison officials did not deny Martin medical care in retaliation for Martin's grievances. Instead, Defendants present evidence Martin refused to submit to restraints necessary to transport Martin to his medical appointment. Martin did not

address Defendants' arguments in any of his filings associated with this Motion.

The Defendants are only partially correct. First, denial of one shower does not give rise to a claim for First Amendment retaliation. No reasonable jury could find that being denied one shower would dissuade a person of ordinary firmness from exercising his or her first amendment rights in the future. Judge Hernandez concluded as much in his January 4, 2012 Order. (Dkt. No. 8 ("Plaintiff alleges that defendant palmer denied plaintiff a shower ' as a form of retaliation.' The denial of a shower on a single occasion does not rise to the level of an Eighth Amendment [claim], and plaintiff does not allege facts giving rise to a retaliation claim.") Therefore, Palmer is entitled to summary judgment on this portion of Martin's claim.

Second, the record demonstrates Palmer did not deny Martin medical care in retaliation for Martin's grievances. On July 13, 2010, Martin had a follow-up appointment with prison doctors to treat injuries incurred during the July 6, 2010 cell extraction. Pursuant to prison regulations that "[a]ll inmates will be placed in restraints when escorted by staff[,]" Palmer ordered Martin to submit to restraints so he could be transported to the infirmary. In response, Martin "became agitated, aggressive, argumentative, and refused to allow [Palmer] place him in restraints." (Palmer Decl. ¶6.) The guards warned Martin that if he refused to submit to restraints, he could not leave his cell and his behavior "would be considered a refusal to attend his medical appointment." (Palmer Decl. ¶ 7.) Martin did not comply with the officers' requests and did not attend his medical appointment. Martin does not produce evidence which creates a genuine issue of material fact on why Defendants refused to transport martin to his medical appointment. Thus, the record demonstrates Palmer did not deny Martin medical care in retaliation for Martin's grievances.

However, Defendants do not demonstrate they are entitled to summary judgment on Martin's

claim that he was subject to verbal harassment.  In the First Amended Complaint, Martin alleges

that, in response to a grievance he filed, Palmer knocked on his cell door one day and began talking

loudly about Martin's grievances against Palmer and generally harassing him.  Martin also alleges

the following:

> Writing grievances is considered as "snitching" by prisoners.  Defendant[']s
> comment was made to make plaintiff look like a snitch in the eyes of prisoners.
> After defendant[']s comment, prisoners began yelling rat, snitch, and profanities at
> plaintiff.  Defendant[']s comment was made in an attempt to dissuade plaintiff from
> using [the] grievance procedure . . . [and] placed plaintiff at risk [of] being attacked
> by other prisoners[] upon plaintiff[']s release from segregation.

(First Am. Compl. ¶ 30.)  In his January 4, 2012 Order, Judge Hernandez held Martin's claim for

retaliation failed as a matter of law when premised only on Palmer's comment, "how's the leg."

However, Judge Hernandez did not address Martin's allegations that Palmer broadcasted to other

inmates that Martin was using the grievance system, which many prisoners considered "snitching"

and deserving of retaliation.

"The exchange of verbal insults between inmates and guards is a constant, daily ritual

observed in this nation's prisons of which the courts do not approve," but would not cause a chilling

effect on a prisoner's exercise of the First Amendment.  Thus, "harassment or abuse [without more]

. . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Oltarzewski v.*

*Ruggiero*, 830 F.2d 136, 138 (9th Cir. 1987) (quoting *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir.

1979)) (brackets omitted).  However, where a prison official conspires to place an inmate in

heightened danger of assault because of that inmate's grievances, it may give rise to a claim for First

Amendment retaliation.  *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989).  In

*Valandingham*, a prison guard repeatedly called the plaintiff a "snitch" in front of other prisoners.

*Id*. at 1138-39.  The plaintiff alleged the guard labeled him a snitch because the plaintiff had filed

a grievance and created a heightened risk he would be attacked by other prisoners. *Id.* The District Court dismissed the plaintiff's claim for First Amendment retaliation, but the Ninth Circuit reversed. *Id.* It reasoned that a genuine issue of fact existed regarding "whether defendants targeted [the plaintiff] for inmate retribution by identifying him as a 'snitch.'" *Id.* Moreover, the court determined that if the plaintiff proved his allegations, he would be entitled to relief under § 1983. *Id.*

Here, Palmer did not merely harass Martin for filing a grievance against him. Palmer broadcast to the prison population that Martin was filing grievances. In doing so, he labeled Martin a "snitch" in front of other prisoners and subjected Martin to a heightened risk of abuse. Defendants do not deny Martin's allegations. While the threat of verbal harassment would not dissuade an individual of ordinary firmness from exercising his or her First Amendment rights, the threat of violence at the hands of one's fellow inmates would. Defendants, therefore, fail to carry their burden of demonstrating Martin cannot succeed in his First Amendment Retaliation claim against Palmer.

### C. Hays

Martin next alleges Hays retaliated against him in violation of his First Amendment by: (1) mocking him for, and otherwise discouraging him from, using the prisoner grievance procedure; (2) filing a false disciplinary report; and (3) putting Martin in segregation for utilizing the grievance procedures. Hays denies that he attempted to "dissuade" Martin from filing grievances and contends he did not retaliate against Martin for filing grievances.

The court should grant summary judgment in Hays's favor. First, Defendants have introduced evidence that contradicts each of Martin's allegations. Hays testified that he filed misconduct reports not in retaliation for Martin's grievances, but because Martin disobeyed Hays's

orders and took a shower when he was not authorized to do so.  Martin does not produce evidence to rebut Hays's version of events.  Thus, Hays is entitled to summary judgment.

Second, Hays contends Martin was placed in a segregation unit not because he filed grievances, but because Martin called Hays a "punk bitch" in the presence of other inmates.  As a result of Martin's conduct, Hays filed charges against Martin for violating rules governing inmate conduct.  Martin was convicted of these violations and sentenced to a term in a segregation unit.  Thus, Hays filed the misconduct report and filed charges leading to Martin's incarceration to segregation pursuant to the legitimate penological interest in maintaining order among the prisoners.  Again, Martin does not dispute Hays's version of events, and does not produce evidence to rebut Hays claim that these actions were taken for a legitimate penological interest.  Thus, the court should grant Hays summary judgment.

Third, Martin's claim premised on Hays's alleged verbal abuse fails as a matter of law.  A factual dispute exists regarding how Hays dissuaded Martin from utilizing the grievance procedure.  Martin alleges that when he asked Hays for a grievance form, Hays would ask why Martin needed it, told him "[i]t's not gonna do you no good" and laughed at him.  Hays contends he merely told Martin to ask for the grievance form later after the inmates had finished eating dinner.  However, even if the court fully credited Martin's allegations and fully discredited Hays's declaration, Hays is entitled to summary judgment.  The Ninth Circuit has broadly held that "verbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Oltarzewski*, 830 F.2d at 139; *see also Lewis v. Robascoitti*, 465 Fed. Appx. 676, *1 (9th Cir. 2012) (mem.)  Moreover, the remarks Martin alleges would not dissuade an individual of ordinary firmness from exercising his or her constitutional rights.  Therefore, Hays is entitled to summary judgment.

### D. *Jennings*

Defendants move for summary judgment on Martin's claims against Jennings and argue Judge Hernandez dismissed Martin's First Amendment retaliation claim against Jennings in his May 7, 2012 Order.  Defendants misconstrue Judge Hernandez's ruling, but are nonetheless entitled to summary judgment.  In the May 7, 2012 Opinion and Order, Judge Hernandez held that "mere verbal harassment does not give rise to a constitutional violation."  (Dkt. No. 33 at 6.)  However, Judge Hernandez later held that "plaintiff shall be permitted to proceed in his First Amendment retaliation claim against defendants Palmer and Jennings (retaliation in response to plaintiff filing grievances)."  (Dkt. No. 33 at 7.)  Although these holdings seem contradictory on their face, Martin grouped together his Eighth Amendment claims and First Amendment retaliation claims under the broad umbrella of "claim two."  Judge Hernandez's holding referred only to Martin's Eighth Amendment claims, while the latter holding was specific to Martin's First Amendment retaliation claims.  Thus, The May 7, 2012 Opinion and Order did not dismiss Martin's First Amendment retaliation claims against Jennings.

Regardless, Jennings is entitled to summary judgment.  Martin alleges Jennings verbally abused him and tampered with his food in retaliation for Martin's use of the grievance system.  Martin alleges that in July and August 2010, shortly after guards injured Martin's leg during a cell extraction, Jennings sarcastically asked on two occasions, "how's the leg?"  Martin also claims Jennings shook up his food on one occasion, turning it into "a pile of slop."  Jennings's comments and actions may have been cruel, but they were isolated events and were not so cruel and threatening that they would have caused an individual of ordinary firmness to stop exercising his or her First Amendment rights.  Because Martin fails to raise a genuine issue of material fact on whether

Jennings's comments had a chilling effect, Jennings is entitled to summary judgment.

IV.  Sovereign Immunity

Defendants contend that they are insulated from being sued for damages in their official capacity.  Martin does not address Defendants' sovereign immunity argument in his Response.  On this issue, Defendants are correct, and the court concludes defendants should be dismissed from this case to the extent they are named in their official capacity.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign state.

U.S. CONST. amend. XI.  The text of the Eleventh Amendment appears to divest federal courts of diversity jurisdiction only in cases brought against a state, but the Supreme Court has interpreted the Eleventh Amendment to mean that a state, as "a sovereignty in our federal system . . . [is] not amenable to the suit of an individual without its consent."  *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996), (quoting *Hans v. La.*, 134 U.S. 1, 13 (1890)).  Thus, "states may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity."  *Green v. Mansour*, 474 U.S. 64, 68 (1985).  When a state agency is named as a defendant to a suit, "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit."  *Durning v. Citibank, N.A.,* 950 F.2d 1419, 1423 (9th Cir. 1991).

Similarly, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Thus, the Eleventh Amendment bars suits for damages brought against state officials

sued in their official capacity unless the state consents to liability or Congress abrogates that

liability. *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012).

"It does not, however, bar actions for prospective declaratory or injunctive relief against state

officers in their official capacities for their alleged violations of federal law." *Id.*

The Ninth Circuit has repeatedly held that § 1983 does not unequivocally abrogate a state's

sovereign immunity, and may not be used to recover damages against a state, a state agency, or

government officers acting within their official capacities. *Brown v. Ore. Dep't of Corr.*, 751 F.3d

983, 988-99 (9th Cir. 2014); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (Eleventh

Amendment immunity applies to state agencies); *Flint v. Dennison*, 448 F.3d 816, 824-25 (9th Cir.

2007) (Eleventh Amendment bars claims for damages against state officials in their official capacity

because the damages award would be satisfied with funds from the state treasury). The record

contains no evidence that ODOC or the individually named defendants waived their sovereign

immunity. ODOC, as a branch of the government of the state of Oregon, should be dismissed as a

defendant to this case, and individual defendants named in their official capacity are entitled to

summary judgment to the extent Martin requests an award of damages.

Further, because Martin was released from ODOC custody in July 2015, any request for

prospective injunctive relief would be moot. *See Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001)

([W]hen a prisoner is moved from a prison, his action will usually become moot as to conditions at

that particular facility).

## V.  Qualified Immunity

Defendants next argue that they are immune from suit to the extent Martin alleges claims

against Defendants in their individual capacity. According to Defendants, even if Martin created

a genuine issue of fact on one or more of his claims, the court should grant summary judgment in Defendants' favor on the basis of sovereign immunity.  In light of the court's analysis *supra*, the court need only determine whether Defendants are entitled to qualified immunity on Martin's excessive force claim against Payne, his claim for unconstitutional conditions of confinement against Freeman and Harris, and his claim for First Amendment retaliation against Palmer.  Martin argues Defendants are not entitled to qualified immunity, as the clearly established law demonstrates the Defendants' acts and omissions were unconstitutional.

Under the doctrine of qualified immunity, government officials cannot be held liable "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In *Saucier v. Katz*, the Supreme Court mandated a two-step test to determine whether a defendant is entitled to qualified immunity. 533 U.S. 194, 201 (2001) (receded from by *Callahan*, 555 U.S. at 236). At step-one, the court should determine whether, taken in a light most favorable to the non-moving party, the facts demonstrate a constitutional violation. *Saucier*, 533 U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Callahan*, 555 U.S. at 232. The defendant is immune from suit and should be dismissed as a defendant unless "[t]he contours

of the right [are] sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In shaping the inquiry on step two, the Supreme Court has warned against defining "clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. —, 2015 WL 6829329, at *3 (2015) (quoting *al-Kidd*, 563 U.S. at 742). There need not be a case directly on point to find the law clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate. *al-Kidd*, 563 U.S. at 742, *Mullenix*, 2015 WL 6829329, at *3.

The court has recommended granting Defendants summary judgment on all but three of Martin's claims: (1) his claim for excessive force against Payne during the "hallway incident;" (2) his claim for unlawful conditions of confinement due to Harris's and Freeman's refusal to provide dry clothes during the winter months; and (3) his claim for First Amendment retaliation against Palmer. The court will now determine whether any of these defendants are entitled to qualified immunity.

### A. Excessive Force

Defendants argue the court should dismiss Payne as a defendant to this case because he is entitled to qualified immunity. During the qualified immunity analysis, the court is required to view all facts in a the light most reasonable to the plaintiff and draw all reasonable inferences from those facts in plaintiff's favor. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013). Because several material facts relevant to Martin's excessive force claim are in dispute, the court cannot conclude as a matter of law Payne is entitled to qualified immunity.

Martin contends Payne violently slammed his head into the wall and choked him without provocation and lacking a legitimate penological interest. The only aggravating factor which Martin concedes could explain Payne's behavior is that before being transported from his cell, Martin refused to give the food wrappers from his lunch tray back to guards when they requested he do so. Thus, under Martin's version of events, Payne inflicted force not "to maintain or restore discipline," but merely to inflict unnecessary and wanton pain and suffering on Martin. The law is clearly established that prisoners have a right to be free from unprovoked physical. *Hudson*, 503 U.S. at 6. Therefore, the court cannot conclude Payne is entitled to qualified immunity.

### B. Conditions of Confinement

Defendants argue Harris and Freeman are entitled to qualified immunity on Martin's claims for unconstitutional conditions of confinement based on failure to provide Martin with clean, dry clothes. They contend "a reasonable prison official would not have thought that wet clothing would cause harm, especially when plaintiff had ready access to other sets of clothing and to rubberized protective garb during his kitchen shift." The court disagrees.

Martin contends that, at relevant times during the winter months of 2010 and 2011, he did not have access to dry clothes after his weekend shifts in the prison kitchen. He testified in his verified brief that Harris and Freeman knew this, but nonetheless refused to allow him to exchange his clothes under the "special circumstances" exception to the clothing-exchange policy. It is clearly established law that prison officials have a duty to ensure inmates are given "the minimal civilized measure of life's necessities," including "warmth." *Wilson*, 504 U.S. at 304. A reasonable prison official would have known that depriving an inmate of dry clothing during winter months in a cell-unit where guards often "wear jackets and ear warmers" would deprive that inmate of a minimal

civilized measure of life's necessities.  Therefore, Harris and Freeman are not entitled to summary judgment on their qualified-immunity defense.

### C. First Amendment Retaliation

According to Defendants, Palmer is entitled to qualified immunity on Martin's claim for First Amendment retaliation because "it would not be clear to a reasonable officer that [his] conduct was unlawful under the circumstances present in this case."  The court disagrees.

It is clearly established law in the Ninth Circuit that a prison official may not conspire to place an inmate in heightened danger of physical assault because that inmate has filed grievances. *Valandingham,* 866 F.2d at 1138.  Martin's testimony suggests Palmer did just that by loudly broadcasting to other inmates that Martin had filed several grievances, which are considered "snitching" among the prisoners.  Viewing the facts in a light most favorable to Martin, the court concludes Payne violated clearly established law governing First Amendment retaliation and is not entitled to qualified immunity.

## VI.  Limits on Liability Under the Prison Litigation Reform Act

Defendants move for summary judgment on Martin's requests for injunctive relief and punitive damages.  They contend that awarding Martin an injunction and punitive damages would violate the PLRA.  Martin argues that, under general principles governing punitive damages, the court should deny Defendants' motion, but does not address Defendants' specific motion regarding what remedies are permitted by the PLRA.

### A. Injunctive Relief

Defendants argue Martin is not entitled to his requested injunctive relief under the PLRA because his request for an injunction is too broad.  The PLRA provides the following:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

Since briefing was completed on Defendants' motion for summary judgment, Martin was released from prison. Thus, his request for injunctive relief is moot. "[W]hen a prisoner is moved from a prison, his action will usually become moot as to conditions at that particular facility." *Nelson*, 271 F.3d at 897. Because Martin is no longer subject to the complained-of conditions in ODOC facilities, the court cannot grant Martin meaningful prospective relief by ordering Defendants to relieve him of those conditions. Therefore, his request for injunctive relief is moot, and Defendants are entitled to summary judgment on Martin's claims for injunctive relief.

### B. Punitive Damages

Defendants next contend punitive damages are unavailable under the PLRA's "provisions limiting the availability of monetary damages stemming from mental or emotional harm to cases where prisoners also experience physical injury." (Def.'s Mot. For Summary Judgment at 34.) Martin contends that, at the very least, a genuine issue of material fact exists on whether "defendant's conduct is outrageous, amounting to gross negligence, willful, wanton, and reckless indifference for the rights of others . . . ." (Pl.'s Resp. In Oppo. at 42.)

The court cannot conclude as a matter of law the punitive damages are unavailable to Martin. 42 U.S.C. § 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined to a jail, prison, or other correctional facility, for mental or emotional injury suffered while in

custody without a prior showing of physical injury or the commission of a sexual act." *Id* (abrogated as unconstitutional on other grounds as noted in *Siggers-El v. Barlow*, 433 F. Supp. 2d 811, 813 (E.D. Mich. 2006)).  This section, by its very terms, does not bar recovery of punitive damages, as punitive damages remain available for "physical injury or the commission of a sexual act."  In fact, the Ninth Circuit has specifically held that § 1997e(e) bars punitive damages awards only in cases premised on "mental and emotional injury."  *Olivier v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002).  To the extent a plaintiff's claims are based on constitutional violations or physical injury,  "§ 1997e(e) is inapplicable and those claims are not barred."  *Id*.  Thus, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983)

Defendants do not meet their burden of demonstrating Martin is not entitled to punitive damages as a matter of law.  Under Martin's version of events, which the court must credit given the material facts in dispute, the court cannot conclude that Payne, Harris, Freeman, and Palmer acted without the mental state required for an award of punitive damages.  Therefore, Defendants are not entitled to summary judgment on Martin's claim for punitive damages.

VII.  Compensatory Damages

Last, Defendants argue Martin cannot prove he suffered any actual damages in this case.  The court disagrees.  Compensatory damages, or "actual damages" are the "amount awarded to a complainant to compensate for a proven injury or loss."  *Compensatory Damages*, BLACK'S LAW DICTIONARY (9th ed. 2009).  Defendants do not contend the law bars recovery of compensatory damages for pain and suffering in § 1983 claims, and Martin alleges some degree of pain and

suffering in both his excessive force claim and his claim for unconstitutional conditions of confinement. Thus, Martin may recover compensatory damages under those claims.

A closer question is Martin's First Amendment retaliation claim. The Supreme Court has held that "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" in §1983 cases. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1983). Thus, specific damages are not available to Martin on his First Amendment retaliation claim. That said, nominal damages are available to Plaintiffs in cases where they may not be able to prove actual injury, but are nonetheless entitled to damages in cases involving a violation of constitutional rights. *Carey v. Piphus*, 435 U.S. 247, 266 (1978). The court explained:

> By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Id*.

Such is the case here. Martin did not allege or introduce evidence showing he suffered actual injury as a result of the alleged First Amendment violation. Instead, he contends he was under heightened threat of harm and that his First Amendment rights were violated. Therefore, Martin may collect only nominal damages for any violation of his First Amendment rights which may have occurred.

*Conclusion*

For the aforementioned reasons, Defendants' Motion for Summary Judgment (Dkt. No. 280) should be GRANTED in part and DENIED in part. This court will proceed to trial on Martin's

claim for excessive force premised on the September 19, 2010 altercation with Payne; his claim for unconstitutional conditions of confinement based on Harris's and Freeman's alleged refusal to issue Martin dry clothes during the winter months of 2010 and 2011; and his First Amendment retaliation claim against Palmer.  All remaining claims, including Martin's claims against the Doe Defendants, should be dismissed from this case.

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due January 15, 2016.  If no objections are filed, the Findings and Recommendation will go under advisement on that date.   If objections are filed, then a response is due within fourteen days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 30th day of December, 2015.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge